IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 16, 2014

**STATE OF TENNESSEE v. DERRICK DEWAYNE LYONS**

**Criminal Court for Davidson County**
**No. 2010-C-1694     Mark J. Fishburn, Judge**

_____

**No. M2014-00178-CCA-R3-CD - Filed February 4, 2015**

_____

A Davidson County jury convicted the Defendant, Derrick Dewayne Lyons, of attempted voluntary manslaughter, aggravated assault, theft of property valued over $1,000.00, and evading arrest in a motor vehicle.  For these convictions, the trial court sentenced the Defendant to serve an effective sentence of eighteen years in the Tennessee Department of Correction.  On appeal, the Defendant claims that: (1) the trial court erred when it allowed the State to amend the indictment on the morning of trial; (2) the evidence is insufficient to support his convictions; (3) the State committed "prejudicial prosecutorial misconduct" during its closing argument; (4) the trial court improperly failed to instruct the jury on "mistake of fact" and "use of force"; and (5) the trial court erred when it failed to excuse a juror for cause.  After a review of the record and the foregoing authorities, we affirm the trial court's judgments and the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Kara L. Everett (at trial) and Kyle Mothershead (on appeal), Nashville, Tennessee for the appellant, Derrick Dewayne Lyons.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn Funk, District Attorney General; and Robert E. McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's use of the victim's car without her permission for two days and his encounter and flight from a police officer during his possession of the vehicle. A Davidson County grand jury indicted the Defendant for attempted first degree murder, aggravated assault, theft of property valued over $1,000.00, evading arrest in a motor vehicle and one count of aggravated robbery. The aggravated robbery charge was severed and later "nollied."

**A. Trial**

At the Defendant's trial on these charges, the parties presented the following evidence: Sabrina Mitchell testified that she had known the Defendant for a long time and that he was a guest in her home on August 7, 2008. She recalled that the Defendant asked her to drive him somewhere, to which she responded, "[N]o." Ms. Mitchell stated that she owned a gold Dodge Intrepid that she purchased for approximately $5,000 in 2007. She stated that she had never let the Defendant borrow her vehicle. Ms. Mitchell testified that after she told the Defendant she would not give him a ride, he took her keys and drove off in her vehicle without her knowledge. Ms. Mitchell called his cell phone and asked the Defendant to return her vehicle, and the Defendant said he was on his way back to her house. When the Defendant did not return with her vehicle after a couple of hours, Ms. Mitchell called him again and said she would call the police if the Defendant did not return her vehicle. The Defendant again replied that he was on his way back with the vehicle. Ms. Mitchell said that she did not think that the Defendant had stolen her vehicle, but, when he did not return with it after a couple more hours, she called the police.

Ms. Mitchell testified that she called the police on August 7, 2008, to report her vehicle stolen, but she was told that she would have to wait twenty-four hours to make the report. Over the next twenty-four hours, Ms. Mitchell called the Defendant a few times, but he did not answer. On August 8, 2008, after the twenty-four hour waiting period had passed and her vehicle had not been returned, Ms. Mitchell called the police again and made an "official report" that her vehicle had been stolen. She identified the Defendant as the person who had taken her vehicle.

Ms. Mitchell agreed that her vehicle was returned to her a couple of days later. She stated that the passenger's side window was missing and there were dents and scratches on the vehicle that were not there prior to the vehicle being stolen.

Albert Ridgeway testified that he was a Metropolitan Nashville Police officer assigned to the "flex unit" on August 9, 2008. He stated that he was sitting in his police patrol vehicle when the Defendant drove by in a gold Dodge Intrepid and, when he "ran" the license plate on the vehicle, it came back that the vehicle was reported stolen. Officer Ridgeway followed

2

the Defendant, who was "calm[ly] driving" at that point. The Defendant then started driving "evasive[ly]," and picked up speed, running several stop signs before Officer Ridgeway lost sight of the vehicle. He eventually found the vehicle in an alley, unoccupied and still running. He stated that the driver's side window was "busted out" of the vehicle and the interior was "covered in blood[.]"

On cross-examination, Officer Ridgeway testified that he generally "runs" the license plate of every vehicle in the area where he saw the Defendant.

Brent Bauer testified that he was a Metropolitan Nashville Police officer working on August 9, 2008, with Officer Brandon Firth. He testified that they parked their police vehicle in an alley between First and Second Avenue and spoke with two individuals, one of whom was in possession of a crack pipe. Officer Bauer and Officer Firth wrote the individual a misdemeanor citation, and, while standing outside their police vehicle, Officer Bauer noticed another vehicle enter the alley. He stated that their police vehicle was parked facing southbound and running with its headlights on. He stated that the vehicle's emergency equipment or "blue lights" were not activated.

Officer Bauer clarified that, as soon as they released the individual they had cited for the crack pipe, he heard "tires squealing" and observed a vehicle turn into the alley with its headlights on. He described the vehicle as "swerv[ing]" into the alley and traveling northbound, "coming directly at [the police vehicle.]" Officer Bauer stated that the approaching vehicle appeared to be "gaining speed" and was "traveling extremely, extremely fast" for navigation of an alley. He described the alley as being wide enough "for only one vehicle" with a patch of grass on either side of the pavement and bordered by fence lines. Officer Bauer stated that, on the side of the alley next to where their police vehicle was parked, there was a chain link fence and a "giant oak tree," further narrowing the width of the alley.

Officer Bauer stated that the approaching vehicle was "accelerating the entire time that it was traveling" toward them in the alley. He stated that he and Officer Firth decided to activate the police vehicle's blue lights to alert the driver of the approaching vehicle that they were "parked in the middle" of the alley. Officer Bauer said that, after the blue lights were activated, the approaching vehicle "sudden[ly] decelerated" and then pulled over to the right side of the alley on the passenger's side of the police vehicle. Officer Bauer testified that he was standing on the passenger's side with his door opened. He thought the approaching vehicle was going to stop. Officer Bauer was holding a flashlight and shined it into the windshield where the driver was sitting.

Officer Bauer testified that, as the vehicle approached, he walked to the front of the

3

police vehicle to speak to the driver. As he did so, he noticed that the vehicle accelerated toward him. Officer Bauer testified that, upon realizing that the vehicle was not going to stop, "[he] was kind of in a state of shock." When the vehicle did not slow down, Officer Bauer "pretty much figured that the vehicle had no intentions of stopping and was going to continue to come towards us no matter if it ran over me or hit our car or anything else." He stated that he "figured that if [he] didn't move at that point [he] was going to be [run] over or killed . . . ," so he moved to his right side, away from the patrol car. Officer Bauer stated that the driver had "several opportunities" to pull over.

Officer Bauer testified that he pulled out his weapon and fired a shot at the vehicle as the vehicle drove past him. The vehicle came within a foot to a foot and a half of him, and Officer Bauer felt "the air from the vehicle" as it drove past him. Officer Bauer stated that, if he had not moved, the vehicle would have struck him. Officer Bauer stated that he was later the subject of an internal investigation by the police department because he had fired his weapon.

On cross-examination, Officer Bauer confirmed that the police vehicle had been parked in the alley approximately thirty minutes before the gold Dodge vehicle turned into the alley. He stated that the area where the police vehicle was parked was "well-lit[.]"

Brandon Firth testified that he was a Metropolitan Nashville Police officer, working the "Operation Safe Streets" unit on the night of August 9, 2008. He explained that this meant he was patrolling high crime areas of Nashville to "deter crime." He testified that he was with Officer Bauer that evening and that their police vehicle was parked in the entrance of an alley while the officers issued citations to two subjects. After they had issued the citations, Officer Firth noticed that a vehicle had turned into the alley from "quite a distance away[.]" He said the vehicle's headlights were on as it traveled at a "high rate of speed." Officer Firth activated the police vehicle's emergency "blue light[s]" when the vehicle "didn't seem to be slowing down." He noticed that the approaching vehicle slowed at that point but then accelerated again. Officer Firth described what happened next:

> Officer Bauer was outside of [our police] vehicle on our right side, and he was . . . going to talk to the driver of the vehicle, see what was going on, because, you know, it was obviously speeding and caused a concern to us, we wanted to see what was going on. So, when the vehicle accelerated to our right, I knew Officer Bauer was there and, you know, I yelled to Officer Bauer, "look out," I just saw the car go past mine, I heard a gunshot and then the car kept going and I looked over and Officer Bauer was laying on the ground.

Officer Firth testified that he thought the approaching vehicle had fired shots at the officers,

4

so his first concern was for Officer Bauer's safety. Officer Firth checked on Officer Bauer, who sat up and said, "[g]o get him." The officers got into their police vehicle and pursued until they eventually lost sight of the vehicle

Officer Firth stated that another police unit found the vehicle later that night. He stated that the vehicle in the alley was a "gold or tan Dodge" that he had never seen before. Officer Firth stated that his police patrol vehicle was "marked" and that he turned on his "blue lights" to alert the approaching vehicle that the police were stopped there. He recalled that the Dodge vehicle was three or four hundred yards away when he activated the emergency lights.

Officer Firth testified that he went to view the Dodge vehicle after it was found and that there was blood on the steering wheel and the driver's side window had been shattered. Officer Firth stated that he could not clearly see the driver of the vehicle in the alley, but he got "a glimpse" of the driver and could see it was a black male. He stated that the driver was the sole occupant of the vehicle.

Officer Firth testified that his police vehicle's blue lights were on when they pursued the Dodge vehicle. He stated that he was not able to keep the vehicle in sight for very long during the pursuit. Officer Firth testified that he was interviewed about the incident sometime later.

On re-direct examination, Officer Firth stated that the Dodge vehicle came "pretty close" to hitting his police vehicle and that he was "surprised" that it did not. A map of the area was displayed for the jury and Officer Firth pointed out where his police vehicle was parked in the alley and the direction from which the Dodge vehicle approached.

Warren Fleak testified that he was a Metropolitan Nashville Police Department detective assigned to the crime scene investigative unit. He received a request on August 9, 2008, to conduct an investigation of two vehicles, the "suspect vehicle" and the "officer's vehicle." Detective Fleak "processed" the vehicles for evidence, first attempting to "reposition" the officer's vehicle in the alley to photograph the surrounding area.

Detective Fleak identified photographs of the suspect's vehicle, the gold Dodge, and photographs of blood on the interior. Detective Fleak testified that he collected blood samples for DNA analysis. Detective Fleak and another officer created a diagram of the alley where the incident occurred, which was admitted into the record as evidence, along with photographs of the scene. Based on the photographs, Detective Fleak stated that a streetlight in the alley shone down on top of where the police vehicle was parked. Detective Fleak recovered a .40 caliber Smith and Wesson cartridge casing from the alley.

5

On cross-examination, Detective Fleak clarified that he was called to the scene just after midnight on August 10, 2008. He witnessed the officers' vehicle being driven into the spot in the alley where the incident had occurred. Other police officers were interviewing Officer Firth and Officer Bauer. Detective Fleak stated that he and two other officers were at the scene for almost five hours, looking for cartridge casings and searching the surrounding area.

Cedric Connolly testified that he was a Metropolitan Nashville Police Department detective assigned to the "flex team" in 2008. He came into contact with the Defendant on August 15, 2008, after receiving a report that the Defendant was in an apartment in North Nashville. Detective Connolly knocked on the door of the apartment, and the Defendant opened the door and then immediately shut the door when he saw Detective Connolly and two other officers standing in the doorway. Detective Connolly stated that the Defendant was eventually taken into custody and transported to a hospital to be treated for a wound to his left thumb.

Norris Tarkington testified that he was a Metropolitan Nashville Police Department homicide detective and that his unit investigated cases when an officer discharged his or her weapon during the course of duty. He testified that he was called to the scene of this incident on August 10, 2008, and participated in the investigation. Detective Tarkington stated that he met the Defendant at the hospital after the Defendant had been taken into custody and obtained a blood sample. He stated that the Defendant had gunshot wounds to his forearm and thumb.

On cross-examination, Detective Tarkington stated that Officer Firth and Officer Bauer's statements about the incident were consistent but that there was "some variance" between their two statements.

At the close of the State's evidence, both parties stipulated that the value of the gold Dodge vehicle was between $1,000 and $10,000.

On behalf of the Defendant, Beverly Lyons testified that she was the Defendant's aunt and that he was living with her "on and off" during August 2008. Ms. Lyons testified that she lived in a duplex with an alley in the back of it. She stated that parking for her duplex was located in the back alley. Ms. Lyons testified that the rule for anyone living with her is that they cannot enter or exit the house between 8:00 and 8:30p.m. when she goes to bed. She agreed that the alley behind her house is bumpy and there is not enough width for two vehicles.

The Defendant testified that he was living "on and off" in different homes, including

6

his aunt's, during August of 2008. He agreed that he was on parole when this incident occurred. He stated that he had been in a romantic relationship with Ms. Mitchell and that she had given him permission to drive her gold Dodge Intrepid vehicle. He stated it was not unusual for him to borrow her vehicle without first asking permission or for him to have the vehicle for two or three days at a time.

The Defendant said that Ms. Mitchell heard a rumor that he was driving another woman around in her car and a conflict ensued between he and Ms. Mitchell over that rumor. Their disagreement only lasted several hours, and Ms. Mitchell allowed him to keep using her vehicle. The Defendant did not remember Ms. Mitchell saying she would call the police.

The Defendant stated that on the night of August 9, 2008, he was driving Ms. Mitchell's vehicle to his aunt's house. He agreed that he turned the vehicle into the alley behind his aunt's house and was driving behind her house to see if her lights were on. The Defendant said that his aunt's lights were off, so he drove past her house and proceeded down the alley. He stated that he saw oncoming headlights in the alley but no blue lights. The Defendant testified that he slowed his vehicle down as he approached the other vehicle because he "had to go past it. . . ." The Defendant recalled that as he passed the vehicle on the passenger side, "the shot rung out." He stated that the shot hit his arm. The Defendant said he "couldn't see nothing" because the vehicle's lights were bright. He agreed that there was a tree on the side of the alley opposite where the vehicle was parked and that the space between them was "tight." The Defendant reiterated he never saw blue lights, only headlights.

The Defendant stated that he did not know it was a police vehicle until his brake light shined on it, and he saw a police insignia. He said that he did not turn himself in after the incident because he was scared that the police were trying to kill him.

On cross-examination, the Defendant testified that he was married but separated and in a "sexual relationship" with Ms. Mitchell. He denied that he was divorcing his wife to be with Ms. Mitchell. He reiterated that he had standing permission from Ms. Mitchell to use her vehicle and that on August 7, 2008, he told her that he was taking it and Ms. Mitchell agreed. He denied that Ms. Mitchell called him and asked him to return the vehicle.

The Defendant denied that he was speeding in the alley or that he evaded police officers that tried to pull his vehicle over. He agreed that he abandoned the vehicle to avoid getting into a high-speed chase and hid in the bushes, then went to his uncle's house.

The Defendant testified that he was taken to the hospital after he was arrested and was interviewed by police. He agreed that he gave a recorded statement to Detective Tarkington.

After hearing this evidence, the jury convicted the Defendant of attempted voluntary manslaughter, aggravated assault, theft of property valued over $1,000.00, and evading arrest in a motor vehicle. The trial court sentenced the Defendant as a Range II, multiple offender and imposed an effective sentence of eighteen years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims that: (1) the trial court erred when it allowed the State to amend the indictment on the morning of trial; (2) the evidence is insufficient to support his convictions; (3) the State committed "prejudicial prosecutorial misconduct" during its closing argument; (4) the trial court improperly failed to instruct the jury on "mistake of fact" and "use of force"; and (5) the trial court erred when it failed to excuse a juror for cause.

### A. Indictment

The Defendant contends that the trial court erred when it allowed the State to amend the indictment on the morning of trial. In the indictment, the State sought to change the victim's name from Officer Firth to Officer Ridgeway for the count charging the Defendant with evading arrest in a motor vehicle. This, the Defendant contends, "changed the offense to a completely different accusation" and deprived the Defendant of the opportunity to prepare a defense to the charge. The State responds that the amendment was "minimal" and did not alter the material facts of the case or cause the Defendant to be tried for additional or different offenses. Thus, the State asserts that the trial court did not err in permitting the amendment. We agree with the State.

An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. *State v. Lindsey*, 208 S.W.3d 432, 437-38 (Tenn. Crim. App. 2006) (citing U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000)). Our Courts have interpreted this constitutional mandate to require an indictment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Lindsey*, 208 S.W.2d at 438 (citing *Wyatt*, 24 S.W.3d at 324). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." *Id.* (citing T.C.A. § 40-13-202 (2014)). An indictment need not conform to strict pleading requirements. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

8

Tennessee Rule of Criminal Procedure 7(b) provides:

(b) Amending Indictments, Presentments and Informations.

(1) With Defendant's Consent.  With the defendant's consent, the court may amend an indictment, presentment, or information.

(2) Without Defendant's Consent. Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

The Tennessee Supreme Court continues to emphasize the relaxation of common law pleading requirements, as well as its reluctance to promote form over substance in examining the sufficiency of an indictment.  *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Indictments that satisfy the requirements for adequate notice to the defendant also satisfy constitutional and statutory requirements. *Id.*  Correction of an "unintentional drafting error" does not charge an additional or different offense nor prejudice a substantial right of the defendant if the indictment clearly charges the essential elements of the offense.  *State v. Beal*, 614 S.W.2d 77, 80 (Tenn. Crim. App. 1981).

In the case under submission, we conclude that the trial court did not err when it allowed the State to amend the indictment.  The language of the indictment, along with the specific reference to the statute allegedly violated, provided the Defendant with ample notice of the offense charged.  The indictment stated facts constituting the offense, including the name of the defendant, the date of the alleged offense, and the statute violated.  The fact that the victim's name was changed for the evading arrest charge did not "charge an additional or different offense nor prejudice a substantial right of the [D]efendant."  *See Beal*, 614 S.W.2d at 80.  Accordingly, because the indictment was sufficient prior to its amendment and no new or different offense was charged, we conclude that the amendment of the indictment was proper under Tenn. R. Crim. P. 7(b)(2).  The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant next contends that the evidence was insufficient to support his convictions because "[t]he State failed to prove the *mens rea* element" in any of the counts. He further contends that Sabrina Mitchell's testimony that she did not loan the Defendant her vehicle but that he stole it was insufficient to support his conviction for theft.  The State responds that the Defendant's brief fails to support his claim that the State did not provide

evidence of the *mens rea* element with argument or citation to authorities, and thus, his sufficiency challenge to his convictions is waived, save his conviction for theft. The State further contends that the evidence is sufficient to support his conviction for theft of property valued over $1,000.00.

We agree with the State that the Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.") The Defendant's brief contains one statement of argument, that the State did not provide evidence sufficient to establish the *mens rea* elements of his convictions. The Defendant has failed to support his argument with citation to authorities or the record, however, in the interest of justice, we will address his argument.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the

weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The evidence, viewed in the light most favorable to the State, is sufficient to establish beyond a reasonable doubt that the Defendant acted with the requisite intent to establish his convictions. The *mens rea* required for the conviction of theft of property is "intent to deprive the owner of property[.]" T.C.A. § 39-14-103 (2014). The Defendant was driving Ms. Mitchell's Dodge Intrepid, which the parties stipulated was valued between $1,000 and $10,000. Ms. Mitchell testified that she did not give the Defendant permission to drive her vehicle and that she asked him to return it to her on multiple occasions. The Defendant told Ms. Mitchell that he would return the vehicle to her, but he did not return it after two days, so she notified the police. This is sufficient to show that the Defendant intended to deprive Ms. Mitchell of her vehicle.

A conviction for attempted voluntary manslaughter requires proof beyond a reasonable doubt that the Defendant acted "with intent to cause the victim's death," and "the [Defendant's] conduct constitute[d] a substantial step toward the commission of the offense." T.C.A. § 39-13-211(a); T.C.A. § 39-12-101(a) (2014). A conviction for aggravated assault

requires proof that the Defendant "intentionally or knowingly cause[d] another to reasonably fear imminent [serious] bodily injury." T.C.A. § 39-13-101(a)(2) (2014). The Defendant drove the stolen vehicle down a narrow alley toward a parked police vehicle at a high rate of speed. The speed of the vehicle caused police officers standing next to the police vehicle to activate the police vehicle's emergency lights in an attempt to slow the Defendant down. The Defendant slowed his vehicle and then accelerated again as he neared the police vehicle and Officer Bauer began to approach the Defendant's vehicle. The Defendant and the police officers testified that the alley was not wide enough for two vehicles. Officer Bauer, who was standing on the passenger side of the police vehicle, testified that, as the Defendant's vehicle passed the police vehicle, he had to jump out of the way to avoid being hit and injured by the Defendant. Officer Bauer stated that he would have been injured if the Defendant had hit him with the vehicle. This evidence is sufficient to show that the Defendant acted with the intent to hit Officer Bauer with his vehicle and that his conduct constituted a substantial step toward the commission of the offense of voluntary manslaughter. This evidence is also sufficient to show that the Defendant intended to cause Officer Bauer to fear imminent serious bodily injury.

A conviction for evading arrest in a motor vehicle requires proof beyond a reasonable doubt that the Defendant "intentionally fle[d] by . . . means of [a motor vehicle] from anyone the [Defendant knew] to be a law enforcement officer." T.C.A. § 39-16-603(a)(1)(A) (2014). The Defendant testified that, after he passed the police vehicle in the alley, he saw the law enforcement insignia on the police vehicle. He also admitted that, after he was shot, he hid from the police. Officer Bauer and Officer Firth pursued the Defendant with the police vehicle's emergency lights activated, but the Defendant failed to pull his vehicle over. This is sufficient proof to establish that the Defendant intentionally fled from the officers in a motor vehicle.

Accordingly, we conclude that the Defendant's argument that the evidence was insufficient to establish that the Defendant had the requisite *mens rea* required for these offenses fails.

As to the Defendant's argument that the victim's claim that she had not given the Defendant permission to drive her vehicle is "insufficiently credible to sustain the conviction" for theft of property valued at more than $1,000, we point out that it is within the province of the jury to determine the credibility of a witness and his or her testimony. *See Bland*, 958 S.W.2d at 659 . By its verdict, the jury rejected the Defendant's claim that he had permission to drive Ms. Mitchell's vehicle and accredited her testimony that he did not. The Defendant is not entitled to relief on this issue.

### C. Closing Argument

12

The Defendant next contends that the State "made two improper arguments" during its closing argument: first, that "the State improperly inserted its personal belief as to [the Defendant's] guilt" and made the "prosecutors' personal credibility" an issue for the jury to consider; and second, that the State improperly argued evidence that was not contained in the record that Ms. Mitchell has written letters to the Defendant while he was incarcerated and thus was biased in his favor. The State responds that the Defendant "failed to object contemporaneously" to either comment, and thus has waived the issue on appeal unless he can demonstrate plain error, which the State contends he cannot.

We agree with the State that the Defendant's failure to object to the State's argument at trial precludes our review of this issue, subject to our noticing "plain error." *See* Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in the motion for new trial. . . .); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives any later complaint).

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. *See, e.g., State v. Marshall*, 870 S.W.2d 532 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Carter*, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); *State v. Butler*, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); *Anglin v. State*, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "when 'necessary to do substantial justice,' this Court has the authority to 'consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) We refer to this discretionary consideration of waived issues as "plain error" review. *Id.* (citing *Grindstaff v. State*, 297 S.W.3d 208, 219 n. 12 (Tenn. 2009)).

When considering whether "plain error" exists we consider the following factors: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal

rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test articulated by the Court of Criminal Appeals in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before an appellate court will recognize the existence of "plain error," and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id.* In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642.

"Courts have recognized that closing argument is a valuable privilege afforded to the State and the defense and have afforded wide latitude to counsel in arguing their cases to the jury." *State v. Cleveland*, 959 S.W.2d 548, 551 (Tenn. 1997) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). We have recognized five general areas of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

During the rebuttal portion of its closing argument, the State argued that, in order for the jury to believe the Defendant's version of the events, the jury would also have to believe that multiple police officers lied about the events and that the District Attorney's office had chosen to take part in a conspiracy against the Defendant. This statement was made in response to the Defendant's insinuation that the police officers were fabricating what had happened in the alley and lying during their trial testimony.

Accordingly, we cannot conclude that the State's comment during its rebuttal argument rose to the level of prosecutorial misconduct cited in *Goltz* sufficient to establish a breach of a clear and unequivocal rule of law. It should be noted again that the burden of persuasion on appeal is on the Defendant to demonstrate that the prosecutor's comments "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). There is no indication that the jury was unduly swayed from its duties as explained in the jury instructions. Accordingly, we are of the opinion that the Defendant has failed to carry his burden of persuasion in convincing this Court to consider as plain error the propriety of the allegedly improper comments of the prosecutor in closing rebuttal.

The Defendant also asserts that the State argued facts not in evidence: that Ms.

14

Mitchell had written love letters to the Defendant while he was in prison and was therefore biased in his favor. The State responds that the argument was a reasonable inference from the Defendant's testimony regarding communication that occurred between him and Ms. Mitchell. We agree that, without proof of these letters, the State's argument may have been impermissible. *See Goltz*, 111 S.W.3d at 6. However, the State's comment was not "so improper or . . . so inflammatory that it affected the verdict to the [Defendant's] detriment." *Id.* at 5 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). We conclude that any error in the closing argument pertaining to the issue of the letters was harmless. *See* Tenn. R. App. P. 36(b). This issue is therefore without merit.

### D. Jury Instructions

The Defendant next contends that the trial court erred when it failed to give the jury the "standard 'Mistake of Fact' instruction." He contends that the trial court failed to rule on his request for this instruction during trial, and that, when it addressed the issue during the motion for new trial hearing, the trial court improperly considered the issue as one of credibility. The Defendant also contends that the trial court erred when it failed to instruct the jury on the use of deadly force by law enforcement, which, he contends, would have "illustrate[d] the officers' bias as witnesses." The State responds that the trial court properly denied the Defendant relief on this issue, as the mistake of fact defense was not raised by the evidence, and the trial court's instruction about the credibility of witnesses sufficiently addressed the Defendant's request for a "use of force" instruction.

A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998). Because questions of the propriety of jury instructions are mixed questions of law and fact, this Court's review is de novo, with no presumption of correctness. *See State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001).

"In determining whether a defense instruction is raised by the evidence, the court must

15

examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001) (citing *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). The trial judge does not err when it denies an inaccurate or inapplicable instruction to the case when the charge, in its entirety, "fully and fairly sets out the applicable law." *Id*. (citing *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

### i. Mistake of Fact

The Defendant contends that the jury should have been given the Mistake of Fact instruction because he "mistakenly believed he was not endangering anyone" and such would "negate the *mens rea* element of the charged offenses . . . ." "[I]gnorance or mistake of fact is a defense to prosecution if such ignorance or mistake negates the culpable mental state of the charged offense." T.C.A. § 39-11-502(a) (2014). The trial court must instruct the jury on the defense if it is fairly raised by the proof. T.C.A. § 39-11-203(a), (c) (2014). The Sentencing Commission Comments provide that ignorance or mistake of fact "is a narrow defense." T.C.A. § 39-11-502, Sentencing Comm'n Comments.

We conclude that the Defendant was not entitled to an instruction on the defense of mistake of fact. The Defendant intentionally drove toward the police patrol car parked in the alley ahead of him, but he testified that he did not realize it was a police vehicle until after he had driven past the vehicle and the officers. The Defendant's mistaken belief that he would not harm a person, police officer or otherwise, who was standing in the path of his speeding vehicle is not a defense to the offenses charged. Accordingly, we conclude that the trial court did not err when it failed to submit a mistake of fact instruction to the jury. The Defendant is not entitled to relief as to this issue.

### ii. Use of Force

The Defendant contends that the trial court erred when it denied his request to instruct the jury on Tennessee Code Annotated section 39-11-620, which provides the following:

(a) A law enforcement officer, after giving notice of the officer's identity as such, may use or threaten to use force that is reasonably necessary to accomplish the arrest of an individual suspected of a criminal act who resists or flees from the arrest.

(b) Notwithstanding subsection (a), the officer may use deadly force to effect an arrest only if all other reasonable means of apprehension have been

16

exhausted or are unavailable, and where feasible, the officer has given notice of the officer's identity as such and given a warning that deadly force may be used unless resistance or flight ceases, and:

> (1) The officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or

> (2) The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

T.C.A. § 39-11-620 (2014). The Defendant argued that the instruction was warranted because of the "circumstances of the allegations," any inference that could be drawn from Officer Bauer's inconsistent statements, and to show Officer Bauer's state of mind. The trial court denied the request, concluding that the instruction was irrelevant, primarily because the jury was otherwise being instructed to consider Officer Bauer's credibility and prior inconsistent statements. The trial court noted that Officer Bauer's use of force did not relate to the "ultimate issues" in the case.

We agree with the trial court that the use of force instruction was inapplicable to this case. The language of the statute and the Comments of the Tennessee Sentencing Commission indicate that § 39-11-620 allows law enforcement to use deadly force when effecting an arrest in limited, enumerated circumstances. A law enforcement officer's use of deadly force is "justified" in those circumstances. Here, the question of Officer Bauer's use of force or his justifications for the same were not at issue, as the trial court noted. As such, we agree that the "use of force" issue was not fairly raised by the evidence. Accordingly, we conclude that the trial court did not err when it declined to instruct the jury concerning "use of force." The Defendant is not entitled to relief on this issue.

**E. Removal of a Juror for Cause**

The Defendant argues the trial court erred when it refused to excuse "for cause" a juror who informed the trial court that she was familiar with the Defendant's family. He claims that the juror revealed she disliked and had "negative associations" with the Defendant's family and that this "expression of significant bias should have caused the trial court to excuse her." The State responds that the trial court properly refused to excuse the juror at issue for cause based upon its finding that the juror had satisfactorily stated that she could set aside her associations with the Defendant's family and base her decision only on the evidence presented at trial. We agree with the State.

17

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Tooms v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). In Tennessee, challenges to juror qualifications generally fall into two categories: propter defectum, "on account of defect"; or propter affectum, "for or on account of some affection or prejudice." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. *Akins*, 867 S.W.2d at 355. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. *Id*. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). The defendant bears the burden of proving a prima facie case of bias or partiality. *Id*. (citing *Taylor*, 669 S.W.2d at 700).

Relative to challenges of prospective jurors for cause, Rule 24(c), Tennessee Rules of Criminal Procedure, provides in part as follows:

Any party may challenge a prospective juror for cause if:

(A) Cause Provided by Law. There exists any ground for challenge for cause provided by law;

(B) Exposure to Information. The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

18

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented." *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). The United States Supreme Court has made the following observation:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). Thus, so long as a juror can set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, the juror may properly participate in the case. *Id.* Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *Howell*, 868 S.W.2d at 248; *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989).

In the case at hand, the trial court questioned the juror about her involvement with the Defendant's family, and the juror stated that she recognized the Defendant's family from her restaurant and stated that she had "some kind of confrontation" with a member of the Defendant's family about the price of something in her restaurant. When asked by the trial court whether her exposure to the Defendant's family would "impede or affect" her ability to sit as a juror on the case, the juror replied, "I really don't think so[.]" The juror went on to state that her associations with the Defendant or his family from that exposure "[would] not influence what [she] think[s] is right or wrong. . . ." Based on the juror's comments, both the State and the Defendant expressed their agreement that there was no reason to excuse the juror.

There is no evidence that this juror was not fair and impartial. To the contrary, this juror expressed statements of impartiality. We, therefore, conclude that the Defendant has not proven that the jury who actually heard the case was not fair and impartial. *See Howell*, 868 S.W.2d at 248; *Thompson*, 768 S.W.2d at 246. The Defendant is not entitled to relief on this issue.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE